

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00587-CV
_____

THE UNIVERSITY OF TEXAS AT ARLINGTON, Appellant

V.

JULIE SHAW, Appellee

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-357461-24

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

Appellant the University of Texas at Arlington (UTA) fired Appellee Julie Shaw—the parties dispute why. UTA claims that Shaw was fired for work performance issues, while Shaw claims that she was fired because she was white.

When Shaw sued for race discrimination under Chapter 21 of the Texas Labor Code,[1] *see* Tex. Lab. Code § 21.051(1), UTA filed a plea to the jurisdiction arguing that there were no jurisdictional facts to support Chapter 21's waiver of sovereign immunity because Shaw could not show that UTA's legitimate, nondiscriminatory reasons for firing her were a pretext. The trial court denied the plea, and UTA appeals. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8).

In its dispositive complaint, UTA argues that Shaw (1) had no direct evidence of discrimination; and (2) failed to substantiate her circumstantial discrimination claim under the *McDonnell Douglas*[2] framework because she produced no evidence that UTA's legitimate, nondiscriminatory reasons for firing her were a pretext. We agree on both fronts and will reverse and render.

---

[1] Chapter 21 is often referenced as the Texas Commission on Human Rights Act, but that label is no longer preferred. *See Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 709 S.W.3d 500, 503 n.2 (Tex. 2024) [hereinafter *Flores II*] (explaining legislative history and why the Texas Supreme Court "now refer[s] simply to Chapter 21").

[2] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 1824–25 (1973).

## I. Background

Shaw—who is white—worked for UTA as the executive assistant to the provost. In August 2022, Tamara Brown—who is black—became provost. About a year later, Shaw was fired.

### A. Racial Bias

From Shaw's perspective, her firing was an outgrowth of Brown's racial bias. Shaw alleged that, because she was white, Brown manufactured work performance issues, yelled at her, and generally disrespected her. She pointed to four primary incidents that she claimed revealed the racial motivation behind Brown's actions:

- In 2020, while Brown was serving as the executive dean of a different university, she distributed a letter regarding racial violence. The letter came within weeks of George Floyd's death,[3] and it listed a series of perceived "displays of White supremacy and violence perpetrated against people of color" across the country. Brown expressed her "ang[er]," "frustr[ation]," and "wear[iness]" at the racial violence and encouraged the university's members to "engage in activities . . . [to] help produce the change we desire in our country." According to Shaw, the letter was a "manifesto" that was "blatantly raci[st] against white people."

- In what Shaw remembered as "May [or] June-ish" of 2023, she had recently recovered from cervical cancer, and she told Brown of her gratitude for "the women before [her] who had passed away . . . so that medicine now allowed women to live a full life post-cancer." Not long thereafter, Brown brought up a related book: *The Immortal Life of Henrietta Lacks*.[4] *See generally* Rebecca Skloot,

---

[3] *See State v. Chauvin*, 989 N.W.2d 1, 13–38 (Minn. Ct. App. 2023) (affirming white police officer's conviction for murdering black man—George Floyd—in May 2020 and noting that "this case has garnered substantial publicity not only within the state but across the country").

[4] Brown recalled asking Shaw about some of the books on Shaw's bookshelf, but she denied raising the subject of Henrietta Lacks.

*The Immortal Life of Henrietta Lacks* (2010); *see also HeLa Cell*, Merriam-Webster, https://www.merriam-webster.com/dictionary/HeLa%20cells (last visited Apr. 29, 2026) (defining "HeLa cell" as "a cell of a continuously cultured strain isolated from a human uterine cervical carcinoma in 1951 and used in biomedical research especially to culture viruses" and tracing phrase's etymology to "Henrietta Lacks[, the] 1951 patient from whom the cells were taken"). Brown summarized the book and Lacks's involuntary contributions to medical research. Then, according to Shaw, Brown stated, "the next time you want to thank somebody, . . . don't thank God[,] don't thank your mother[,] don't thank your surgeon[—]thank this black woman," i.e., Henrietta Lacks. [Capitalization altered.]

- About a month later, in "June [or] July-ish" of 2023, Shaw introduced Brown to a new executive assistant, who was black. After a brief discussion, the new assistant left the room, and, by Shaw's account, Brown stated, "now that is what I call an executive assistant."[5] There was no express mention of race, but Shaw interpreted Brown's comment as an "implied" racial "jab."

- Around the same time—"June [or] July-ish" of 2023—a group of staff members introduced Brown to another new executive assistant, who again, happened to be black. According to Shaw, "[a] short time later, Brown walked directly behind [Shaw] . . . [and] sa[id,] 'We're finally getting some competent help around here.'"[6] Again, there was no express mention of race.[7] But again, Shaw perceived a racial "implication."

## B. Work Performance Issues

UTA denied that Brown was racially biased. And more to the point, it denied that Shaw's race was a motivating factor in her termination. Instead, UTA attributed

---

[5]Brown denied making the statement.

[6]Again, Brown denied making the statement.

[7]Shaw also alleged that, on one occasion, Brown told her that she "d[id]n't fit in." But again, there was no express mention of race.

Shaw's termination to a series of work performance issues ranging from general mismanagement to insubordination. It pointed to four specific examples.

The first involved Shaw's management of Brown's schedule. Brown had asked Shaw to prioritize meetings with UTA's leadership and to schedule leadership-requested meetings within 48 hours. According to Brown, Shaw repeatedly failed to comply with this request. Two members of UTA's leadership—UTA vice presidents Kate Miller and Susan Elliott—echoed Brown's criticisms by recalling that Shaw had "resist[ed]" their requests for meetings. But according to Shaw, Brown's 48-hour rule was an "unrealistic" expectation, and she complied as best she could.

UTA's second example of Shaw's work performance issues related to her handling of faculty hiring plans. Shaw was expected to contact certain UTA colleges in May regarding their faculty hiring plans, and when one of Shaw's coworkers—Holly Zander, a financial analyst—discovered on May 24 that Shaw had yet to contact the colleges, she asked Shaw to do so immediately. However, Shaw did not contact the colleges for another month, and only then after Zander stepped in again to help. Zander's boss—Elliott—expressed irritation that Zander had been required to intervene and "handhold[]." She also noted that the recipient colleges had been "frustrated because [Shaw's] lack of planning caused them to have to drop everything and get the information turned around very quickly." Shaw blamed the delay on Brown, explaining that she had been waiting on Brown's approval to move forward.

A third example cited by UTA related to a particular faculty member's tenure review. In February 2023, UTA hired a new dean for one of its colleges, and Brown asked Shaw to immediately contact the college to begin the tenure review process for the new dean.[8] But several months later, in June, the college's leadership contacted Brown and expressed concern that the tenure review process had yet to be initiated. When Brown asked Shaw about the delay, Shaw indicated that she had "plenty of time" because there was still a month remaining to complete the process.

Shaw's fourth alleged performance issue centered around a funding procedure known as STARs.[9] In fact, Brown identified Shaw's handling of the STARs procedure as the single biggest reason for her termination.

The STARs procedure provided for the allocation of certain University of Texas (UT) System funds—STARs funds—to UTA faculty members. It required multiple steps: the provost's office had to receive the individual funding proposals and route them to a review committee, the committee had to make a recommendation to the provost (Brown), the provost had to approve each recommendation, a vice

---

[8]Brown later explained that she had asked Shaw to initiate the tenure review process in February in part because many of the individuals who would participate in the process would have limited availability during the summer months.

[9]STARs stands for Science and Technology Acquisition and Retention program. Brown explained that "[t]he STARs program was established by the UT System to help UT institutions attract and retain high-caliber faculty through provision of funds to support research." During the time relevant here, "UT institutions would . . . receive automatic allocations but would need to follow established guidelines for reporting the funds awarded to [the] UT System."

president (Miller) had to sign off on each recommendation, the decision had to be communicated to another UTA division, and that division had to report the decision to the UT System—all by August 31. Shaw was responsible for receiving the proposals, routing them to the review committee, presenting the committee's recommendations to Brown for approval, taking the applications to Miller for her sign-off, and forwarding the approved proposals to the relevant UTA division for reporting. According to Brown, she directed Shaw to process the proposals on an ongoing basis so that the STARs funds could be allocated as far in advance as possible.[10] Brown's chief of staff, David Abercia, and several of Shaw's coworkers shared this understanding of the process. But Shaw did not. According to her, she was not asked to process the proposals on an ongoing basis, and her deadline was August 31. Thus, Shaw collected the proposals and committee recommendations[11]

---

[10]Brown explained that allocating the STARs funds as soon as possible allowed those funds to be used to "recruit new faculty" via "timely offer letters" and allowed relevant faculty members to plan for the school year. UTA's jurisdictional evidence further indicated that, unless UTA reported its STARs funding allocations in advance of the August 31 deadline, the funds might not be available on September 1; the UT System had to approve allocations prior to the funds becoming available, and last-minute approvals at the end of the fiscal year were subject to delays.

[11]Shaw claimed that she and Abercia had a miscommunication regarding the need for committee review. In her response to UTA's plea to the jurisdiction, Shaw repeatedly cited this miscommunication as evidence of a bona fide misunderstanding. And she does so again in her appellate brief. But Shaw does not claim that this miscommunication was to blame for her failure to process the funding proposals on an ongoing basis. Indeed, Shaw insists that she was not required to submit the proposals on a rolling basis and did nothing wrong in that regard.

and presented them to Brown for approval within 10 days[12] of the August 31 deadline. By Shaw's account, she did nothing wrong—"allowing . . . 9–10 days" was reasonable because, "[i]n [her] opinion, we had time." But Brown and several other UTA employees—including Abercia, Zander, and Miller—disagreed. According to them, Shaw did not follow the STARs procedure and her delay jeopardized the funding allocations[13] and forced others to scramble at the last minute.

## C. Termination

After the STARs funding issues, Brown sent Shaw an email chastising her for failing to follow instructions, noting that they had discussed similar performance issues in the past, contemplating the need for disciplinary action, and asking to meet with her. Following the meeting, Brown penned a letter to UTA's human resources division requesting approval to fire Shaw.

Brown's termination request gave a detailed description of Shaw's work performance issues, and it was supported by accompanying written statements from

---

[12]Shaw claims that she had all of the STARs documents ready for Brown's approval on August 22 and that, although she had been scheduled to meet with Brown on that day, Brown canceled the meeting, so the documents were not presented to Brown until August 28. In any event, Shaw did not attempt to present the STARs funding proposals to Brown until at least August 22—within 10 days of the deadline.

[13]UTA's jurisdictional evidence indicated that, if it failed to award more than a quarter of its STARs funds, it was required to send a written explanation to the UT System.

several other UTA employees, including Zander, Elliott, and Miller. The termination was approved, and UTA sent Shaw a termination letter in October 2023.

But Shaw's termination letter did not reference her work performance issues. Instead, the boilerplate letter stated merely that Shaw's "position . . . [wa]s without fixed term and subject to termination at the discretion of the institution" and that her employment "[wa]s terminated, effective immediately."

After Shaw's termination, Brown hired a black person as Shaw's permanent replacement.[14]

## D.    Litigation

Shaw filed suit against UTA under Chapter 21, alleging that she had been fired because she was white.[15] *See* Tex. Lab. Code § 21.051(1). UTA responded with a combination plea to the jurisdiction and motion for summary judgment. It argued that Chapter 21's waiver of sovereign immunity did not apply because Shaw's evidence of discrimination was circumstantial and, under the legal framework for circumstantial cases—the *McDonnell Douglas* framework—UTA had offered legitimate reasons for the termination and Shaw could not show that those reasons were a pretext.

---

[14]Before hiring Shaw's replacement, Brown asked another UTA employee—a white person—to temporarily fill Shaw's position while she interviewed new executive assistants.

[15]Shaw also pleaded a claim for retaliation, but on appeal, she abandons that claim.

9

Shaw responded with a variety of arguments and exhibits.[16]  As relevant here, she argued that (1) Brown's statements constituted direct evidence of race discrimination; and (2) even if they did not and the *McDonnell Douglas* framework applied, UTA's termination letter had not identified legitimate reasons for firing her, and UTA's work performance complaints were not credible.  The trial court denied UTA's plea without specifying a basis for its ruling.

## II.  Standard of Review

We review the trial court's ruling on a plea to the jurisdiction de novo.  *Univ. of N. Tex. Health Sci. Ctr. v. Paul*, No. 02-22-00305-CV, 2023 WL 4779480, at *2 (Tex. App.—Fort Worth July 27, 2023, no pet.).

UTA's plea was premised on its sovereign immunity.  "As a state university, [UTA] is immune from suit absent an express legislative waiver."  *Flores II*, 709 S.W.3d at 504.  Chapter 21 provides one such waiver, "but only if the plaintiff alleges facts that would establish that the state agency violated [Chapter 21] and, when challenged with contrary evidence, provides evidence that is at least sufficient to create a genuine

---

[16]One such exhibit was Shaw's responses to UTA's interrogatories.  UTA objected to this exhibit under Texas Rule of Civil Procedure 197.3, but the trial court overruled the objection.  *See* Tex. R. Civ. P. 197.3 ("Answers to interrogatories may be used only against the responding party.").  On appeal, UTA argues that the ruling was an abuse of discretion.  We need not review the issue, though, because even if Shaw could have relied on her own interrogatory responses as jurisdictional evidence, she still failed to create a genuine fact issue regarding pretext.  *See* Tex. R. App. P. 47.1.

fact issue material to that allegation." *Id.* at 504–05; *see Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770–71 (Tex. 2018).

An employer violates Chapter 21 if it "discharg[es]" an individual "because of race." Tex. Lab. Code § 21.051(1); *see Flores II*, 709 S.W.3d at 505 (clarifying that such a practice "is unlawful if discrimination was a motivating factor for [the] practice, even if other factors also motivated the practice" (internal quotation marks omitted)). A plaintiff who alleges race discrimination in violation of Chapter 21 and who is confronted with a plea to the jurisdiction must create a genuine fact issue regarding the jurisdictional basis for her claim in one of two ways. *Tarrant Cnty. Coll. Dist. v. Chavez*, No. 02-25-00176-CV, 2025 WL 2884214, at *3 (Tex. App.—Fort Worth Oct. 9, 2025, no pet.); *City of Richland Hills v. Childress*, No. 02-20-00334-CV, 2021 WL 4205013, at *3–4 (Tex. App.—Fort Worth Sept. 16, 2021, pet. denied).

The first path—that relying on direct evidence—requires the plaintiff to produce evidence that "proves the fact of discriminatory animus without inference or presumption." *Paul*, 2023 WL 4779480, at *4; *see AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 593 (Tex. 2008). This path is uncommon, though, as "smoking guns are hard to come by." *Alamo Heights*, 544 S.W.3d at 781–82; *see Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020) [hereinafter *Flores I*].

Thus, most Chapter 21 claims follow the second path, which allows the plaintiff to rely on circumstantial evidence of discriminatory intent if she can satisfy the *McDonnell Douglas* framework. *Flores II*, 709 S.W.3d at 505; *Flores I*, 612 S.W.3d at

11

305; *see McDonnell Douglas*, 411 U.S. at 802–04, 93 S. Ct. at 1824–25.   Under that framework, the plaintiff bears the initial burden to present a prima facie case giving rise to a presumption of discriminatory intent.  *Flores II*, 709 S.W.3d at 505.  Assuming the plaintiff can satisfy this step—as UTA's plea assumed here—the governmental entity can defeat the presumption "by producing evidence of a legitimate, nondiscriminatory reason for the disputed employment action."  *Alamo Heights*, 544 S.W.3d at 781–82; *see Flores II*, 709 S.W.3d at 505; *Chavez*, 2025 WL 2884214, at *3.  At that point, to avoid dismissal, the plaintiff must respond with evidence "that the employer's stated reason is false and a pretext for discrimination."[17]  *Alamo Heights*, 544 S.W.3d at 781–82; *see Flores II*, 709 S.W.3d at 505.

In assessing whether a plaintiff has carried her burden to satisfy the *McDonnell Douglas* framework, we view the jurisdictional evidence in the light most favorable to her.  *Flores II*, 709 S.W.3d at 505.  Although "we cannot disregard evidence necessary to show context," we indulge all reasonable inferences in the plaintiff's favor if a reasonable factfinder could do so.  *Id.*; *Alamo Heights*, 544 S.W.3d at 770–71; *Dall.*

---

[17]Cases under path one—those involving direct evidence—are classified as "'mixed-motive' case[s]," while those under path two—relying on circumstantial evidence—are classified as "pretext case[s]."  *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 475–80 (Tex. 2001) (clarifying that, "[i]f the plaintiff has only circumstantial evidence of discrimination, it will be classified as a pretext case regardless of how many motives the employer had," even though the "motivating factor" standard of causation applies to all Chapter 21 claims).

12

*Cnty. Hosp. Dist. v. Ballew*, No. 05-22-01358-CV, 2024 WL 1269075, at *7 (Tex. App.—

Dallas Mar. 26, 2024, no pet.).

### III. Discussion

On appeal, UTA argues that (1) Brown's statements were not direct evidence

of discrimination, so path one did not apply; and (2) Shaw did not carry her burden

under path two's *McDonnell Douglas* framework because, after UTA produced evidence

of its legitimate reasons for firing her, she presented no evidence that those reasons

were a pretext for discrimination.[18]

### A. Path One: Shaw produced no direct evidence of discriminatory intent.[19]

Shaw pointed to four statements that she claimed were direct evidence of

Brown's discriminatory intent: Brown's letter regarding racial violence in 2020; her

comment regarding Henrietta Lacks in May or June of 2023; and her two statements

upon meeting the new black administrative assistants in June or July of 2023. But

none of these constitute direct evidence of discriminatory intent.

---

[18]UTA raises three other appellate issues: one challenging the trial court's ruling on its objection to Shaw's jurisdictional evidence and two more challenging the trial court's failure to grant its plea to the jurisdiction as to Shaw's retaliation claim. We need not address any of these issues—the first is not dispositive, *see supra* note 16, and the latter two are moot, *see supra* note 15.

[19]Shaw argues that, because UTA's plea classified her evidence as circumstantial rather than direct, UTA did not preserve its argument regarding Shaw's allegedly direct evidence of discrimination. We disagree. The fact that Shaw and UTA disputed the classification of Shaw's evidence did not render UTA's plea insufficient to preserve the issue.

For a statement to qualify as direct evidence of discriminatory intent, it must, among other things, "relate[] to the employment decision at issue," be "close in time to the employment decision," and "prove[] the fact of discriminatory animus without inference or presumption." *AutoZone*, 272 S.W.3d at 592–93; *Paul*, 2023 WL 4779480, at *4. Here, none of the statements that Shaw relies upon were "related to the [termination] decision at issue." *See AutoZone*, 272 S.W.3d at 592–93. Nor were any of the statements "close in time" to the termination decision. *See id.* The 2020 letter and May, "June-ish," or "July-ish" 2023 statements came months—if not years—before Shaw's October 2023 termination. In fact, Brown distributed the 2020 letter before she even began working at UTA. Furthermore, two of Brown's challenged statements—those regarding the new administrative assistants—required an "inference or presumption" to connect them to race. *See Paul*, 2023 WL 4779480, at *4. Shaw herself, in her deposition, described Brown's alleged references to race as "implied." And in her brief, Shaw labels the statements "innuendo," which, by definition, requires an inference to interpret the "insinuat[ed]" meaning. *Innuendo*, Merriam-Webster, https://www.merriam-webster.com/dictionary/innuendo (last visited Apr. 29, 2026) (defining "innuendo" as "an oblique allusion," a "hint," or an "insinuation" (capitalization altered)); *see Paul*, 2023 WL 4779480, at *5 (holding that description of woman as "abrasive" was not direct evidence as it "require[d] an inference of sexism").

14

Thus, Shaw did not identify any direct evidence of discriminatory intent. The trial court could not deny UTA's plea to the jurisdiction under path one.

## B. Path Two: Shaw did not create a fact issue regarding pretext.

Because there was no direct evidence of discriminatory intent, Shaw was required to show the trial court's jurisdiction for her Chapter 21 claim by satisfying path two's *McDonnell Douglas* framework. *See Flores II*, 709 S.W.3d at 505. UTA argues that, assuming Shaw could satisfy the first step of the framework, UTA nonetheless presented legitimate reasons for firing her, and she had no evidence that those reasons were a pretext for discrimination. *Cf. id.* at 505–06 (reviewing denial of jurisdictional plea when employer did not challenge step one of *McDonnell Douglas* framework).

### 1. Legitimate, Nondiscriminatory Reasons

UTA claimed that Shaw's work performance issues were its true, legitimate, and nondiscriminatory reasons for firing her. *See City of Richland Hills v. Childress*, No. 02-20-00334-CV, 2021 WL 4205013, at *5–6 (Tex. App.—Fort Worth Sept. 16, 2021, pet. denied) (recognizing employee's alleged insubordination as legitimate reason for termination and later commenting that termination for insubordination rather than work performance issues was "a distinction without a difference").

And it produced jurisdictional evidence of those work performance issues; it offered, among other things, deposition testimony from Brown and Abercia; a sworn declaration from Brown; a copy of Brown's email to Shaw regarding her handling of the STARs procedure; a copy of Brown's letter to UTA's human resources division

15

requesting approval for Shaw's termination; the written statements from other UTA employees criticizing Shaw's work; and various emails and text messages that supported UTA's description of events.

Shaw acknowledges this evidence. However, she argues that UTA could not rely on its stated work performance justification because it did not enunciate that justification in its boilerplate termination letter to her. According to Shaw, UTA—and any employer accused of discriminatory termination—is legally bound by the explanation (or lack thereof) in its termination letter.

But Shaw has not cited—nor has this court found—any statute, rule, or precedent that limits the scope of an employer's Chapter 21 defense based on the breadth of the explanation the employer provided in its termination letter. And to the extent that she invites us to judicially create her proposed limitation, we decline to do so.

UTA could rely on its work performance criticisms as legitimate, nondiscriminatory reasons for firing Shaw. It carried its burden of production under the *McDonnell Douglas* framework. *See Filardo v. Baylor Scott & White Health*, No. 05-21-01066-CV, 2023 WL 5317870, at *8 (Tex. App.—Dallas Aug. 18, 2023, no pet.) (reviewing Chapter 21 claims under *McDonnell Douglas* framework and noting that "[i]t is relatively easy" for an employer to satisfy its burden of production because it "need only articulate a lawful reason, regardless of what its persuasiveness may or may not be"); *Valles v. McLane Foodservice, Inc.*, No. 02-17-00134-CV, 2018 WL 547782, at *5

16

(Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (describing employer's burden as "one of production only" with "no credibility assessments" and the employer's stated reasons "taken as true").

## 2. No Evidence of Pretext

The burden therefore shifted back to Shaw to raise a genuine fact issue as to whether UTA's stated reasons for firing her were a pretext for discrimination. *See Flores II*, 709 S.W.3d at 505–06. Generally, a plaintiff can satisfy this burden with evidence that the employer's stated reasons were false or unworthy of credence. *Id.* at 506–07 (noting that, usually, evidence of falsity in combination with prima facie case may permit an inference that the employer was attempting to hide its discriminatory intent). And Shaw claims that she did so by presenting evidence that (1) UTA gave "shifting" and undocumented reasons for her termination; (2) UTA's criticisms were based on Brown's "subjective discontent" and were "totally contradicted by Shaw"; and (3) Brown's race-related statements and selection of a black replacement reflected an underlying racial bias. These arguments fail.

### a. UTA's reasons were neither shifting nor undocumented.

First, Shaw's characterizations of UTA's reasons as "after-the-fact," "chang[ing] . . . over time," and "lack[ing] . . . documentation" are belied by the record. *See Filardo*, 2023 WL 5317870, at \*9 (acknowledging that "lack of documentation otherwise regularly kept may tend to show pretext" but noting that

17

"the record contain[ed] no shortage of contemporaneous documentation" about the employee's concerning behavior).

UTA did not, in fact, give shifting reasons for its termination decision, nor did it fail to document its work performance concerns. To the contrary, the jurisdictional evidence revealed that, for at least a month before Shaw was fired, she was repeatedly informed of her work performance issues, and those issues were detailed in writing:

- Shaw, in her deposition testimony, recalled Brown's criticism of her work performance—including her scheduling practices and handling of the STARs funding procedure—in the months before her termination.

- Brown's email to Shaw after the STARs funding issues documented "what [they] ha[d] been discussing recently concerning [Shaw's] handling of the [STARs funding] approval process," her "refusal to follow [Brown's] explicit directive," and Brown's "contemplat[ion of] disciplinary action."

- Abercia, in his deposition testimony, confirmed that there were "several e-mails and conversations" with Shaw "talking about performance expectations" and that "enough conversation [had occurred] for [Shaw] to understand that [termination] was potentially an action to be taken."

- Brown's letter to the human resources division requesting to terminate Shaw detailed Shaw's work performance issues, including her failure to promptly schedule leadership-requested meetings, her delay in contacting the UTA colleges regarding faculty hiring plans, her lack of urgency in initiating the tenure review process, and her handling of the STARs procedure.

This evidence—which Shaw herself offered in response to UTA's plea to the jurisdiction—undermines her argument that UTA's work performance criticisms were undocumented and manufactured "after[ ]the[ ]fact."

18

### b. UTA's reasons were not premised on one witness's "subjective" account.

As for Shaw's characterizations of UTA's stated reasons as "purely subjective" and dependent on Brown's "totally contradicted" statements, such characterizations are misguided.

First, subjectivity does not necessarily raise a fact issue regarding the credibility of an employer's nondiscriminatory reasons for its employment decision. *See e.g., Flores II*, 709 S.W.3d at 506–10 (holding no evidence of pretext even though university's stated reasons for hiring a younger individual over plaintiff relied on the university president's "weigh[ing of] th[e candidates'] qualifications" and his lack of confidence in plaintiff's abilities); *see also id.* at 513–14 (Blacklock, J., concurring) (lamenting judicial second-guessing of employment decisions, reiterating lack of evidence of discriminatory intent in hiring decision, and emphasizing that the decision "was the [university p]resident's decision to make" and required him to "choose someone in whom he *personally* has great confidence").

And second, UTA did not rely solely on Brown's—or any other single witness's—subjective assessment of Shaw's performance. In addition to Brown, five other UTA employees provided written statements or deposition testimony criticizing Shaw's work performance:[20]

---

[20]Additionally, the UTA vice president overseeing the human resources division—Jewel Washington—confirmed, in a sworn declaration, that Brown had informed her of Shaw's work performance issues and that Washington had

- Miller described—in deposition testimony and in a written statement—how Shaw had resisted scheduling her for meetings with Brown. The UTA vice president further recalled how, when she made suggestions regarding the STARs procedure, Shaw "insisted that her way [wa]s the better way." Miller characterized Shaw as "[u]nwilling[] to listen"; "[i]naccurate[]" in her descriptions of Brown's requests or instructions; "disorganized"; and "inefficient."

- Another UTA vice president—Elliott—provided deposition testimony and a written statement describing Shaw's "struggle[s] with managing [Brown's] calendar" and her failure "to be proactive in planning." Elliott recalled how, on one occasion, she contacted Shaw several months in advance to reschedule two of her standing meetings with Brown, and Shaw responded that she "[wa]s not going to worry about those until it gets closer to those dates." Elliott further recounted Shaw's delay in contacting the UTA colleges regarding their faculty hiring plans and how Zander had needed to provide "handholding."

- One of Shaw's coworkers—Kierra Godfrey, the liaison between the provost's office and the UT System for STARs purposes—provided a written statement regarding Shaw's work on the STARs procedure. Godfrey stated that she met with Shaw in mid-2023 to clarify the process and that, after the meeting, she followed up with an email reminder regarding the need to submit STARs funding applications "as soon as possible." Godfrey recalled that, despite the meeting and email, Shaw had not followed the procedure, and her failure to do so caused "last-minute scrambling."

- Another of Shaw's coworkers—Zander—described various mid-2023 meetings and communications that had involved Shaw and that had clarified the STARs funding procedure. Yet, Zander recalled Shaw telling her in mid-August that she was "not in a rush to collect the [STARs] packets" because they would not be processed until September.

- Brown's chief of staff—Abercia—confirmed in his deposition that Shaw had been informed "[o]n multiple occasions" that she "needed to submit the [STARs] applications on a rolling basis."

---

considered such issues to be valid grounds for termination. Washington asked another human resources employee to review Brown's request for approval of Shaw's termination as well, and that employee too recommended firing Shaw.

Shaw largely ignores these witnesses' accounts, dismissing them as contradictory and instead focusing on Brown's credibility, which Shaw claims is lacking.[21] But Shaw has not identified any material contradictions to draw the other witnesses' statements into question.[22] *See Filardo*, 2023 WL 5317870, at *9 (acknowledging that "[a]pparent inconsistencies between the explanations an employer has offered may be useful evidence on pretext," but noting that "[t]here were no such inconsistencies"); *Childress*, 2021 WL 4205013, at *6–7 (recognizing that "weaknesses, implausibilities, inconsistencies, or contradictions" in the evidence may constitute "some evidence of pretext"). And although Shaw disputes many aspects of the witnesses' accounts, "an employee does not raise a fact issue on the question of pretext merely because [s]he disagrees with the employer's assessment of h[er] performance." *Ballew*, 2024 WL 1269075, at *10 (reviewing pretext in context of disability discrimination claim); *see Valles*, 2018 WL 547782, at *6–7 (holding employee presented no evidence of pretext when "[m]any of [his] arguments [we]re nothing more than [his] conclusory assertions that his performance was acceptable . . . and [that] everyone at [his employer] lied about his performance and behavior"). "[R]ather, the issue is whether the employer's

---

[21]Shaw alleges that Brown gave "false testimony," "mischaracterize[d]" events, "lambasted Shaw on false grounds," and "undermined her own credibility in numerous statements . . . reflecting her imperiousness . . . and her lying to Shaw."

[22]Shaw asserts that there were "striking conflicts . . . among UTA's witnesses[]," ambiguously referencing 10 pages of her statement of facts for support. But it is unclear what portions of the cited 10 pages Shaw considers "striking conflicts"; she does not elaborate.

perception of h[er] performance, accurate or not, was the real reason for h[er] termination." *Ballew*, 2024 WL 1269075, at *9–11 (holding that employee's "conclusory testimony" disagreeing with his employer's assessment of his performance constituted no evidence of pretext); *see Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 438–39 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (holding employee's affidavit defending job performance was no evidence of pretext and reiterating that "the issue is whether the employer's perception of his performance, accurate or not, was the real reason for his termination"); *see Chandler v. CSC Applied Techs., LLC*, 376 S.W.3d 802, 818 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (reviewing discrimination claim and agreeing with employer that, "even if [the plaintiff] raised a fact issue regarding whether he actually worked unauthorized overtime [as the employer claimed was the basis for his firing], this fact is irrelevant, because the ultimate inquiry is whether [the employer] had a good faith belief that [the plaintiff] had violated the workplace rules"). And given the numerous witnesses who corroborated Brown's description of Shaw's workplace performance issues, Shaw did not present any evidence that would allow a reasonable factfinder to disbelieve UTA's stated reasons for firing her.

### c. Brown's statements and Shaw's replacement were no evidence of pretext.

Finally, Shaw argues that Brown's four race-related statements and her replacement of Shaw with a black individual amounted to some evidence of pretext.[23]

Generally, "[race]-related comments by the relevant decisionmaker *can* be evidence supporting a finding of pretext." *Flores II*, 709 S.W.3d at 509–10. But they "must be considered in context." *Id.* (holding no evidence of pretext in age discrimination case even though decisionmaker made age-related comments).

Here, Brown's four allegedly race-related statements—her 2020 letter, mid-2023 reference to Henrietta Lacks, and "June [or] July-ish" 2023 statements regarding the new black assistants—occurred long before Shaw's October 2023 termination, and none of the statements contemplated firing anyone, much less doing so because of their race. *See Niu v. Revcor Molded Prods. Co.*, 206 S.W.3d 723, 729–30 (Tex. App.—Fort Worth 2006, no pet.) (rejecting argument that alleged discriminatory comments raised fact issue regarding pretext when the comments occurred eight months or more before termination and the evidence "d[id] not show that any of the comments were

---

[23]In one portion of her brief, Shaw attempts to show Brown's discriminatory intent by pointing to a list of other white UTA employees who, when they left their positions, were replaced by individuals who were homosexual, black, Asian, or otherwise of "minority status." But Chapter 21 does not authorize a claim for discrimination based on a plaintiff's general non-minority status. *See generally* Tex. Lab. Code § 21.051. Regardless, Shaw expressly declines to rely on her list of "minority status" replacements as evidence of pretext. *Cf. Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015) (noting that "the strength of the prima facie evidence may also be considered at the pretext stage").

related in any way to [the plaintiff's] termination"); *cf. Goudeau*, 793 F.3d at 475–78 (holding that supervisor's statement of his intent to fire two of plaintiff's coworkers who he described as "old farts" were relevant to both prima facie case and pretext). Indeed, Brown's comments regarding the new assistants did not even mention race, and apart from Shaw's own perception of those statements, she did not offer any evidence that would allow a reasonable factfinder to interpret them as race-related. *See Flores II*, 709 S.W.3d at 509–10 (rejecting argument that age-related comment raised fact issue regarding pretext because, in context, comment did not create fact question regarding governmental entity's legitimate reasons for employment decision).

As for Brown's hiring a black person to replace Shaw, that fact was "not relevant in determining pretext." *Valles*, 2018 WL 547782, at *7 (stating in review of age discrimination case involving allegedly discriminatory termination that "the fact that [the plaintiff] was replaced by [a person] who was more than ten years younger . . . [wa]s relevant only as to whether [the plaintiff] established a prima facie case of discrimination; it [wa]s not relevant in determining pretext"). And even if it were relevant, it too would "be considered [only] in context." *Cf. Flores II*, 709 S.W.3d at 507–10 (holding no evidence of pretext in case involving allegedly discriminatory hiring decision and discussing replacement's qualifications as potential evidence that employer's stated reasons for hiring younger candidate were false). UTA offered

evidence that Shaw's replacement was amply qualified for her new role,[24] and Shaw did not dispute that fact. There was no evidence that Brown hired Shaw's replacement over a more qualified white candidate, that Brown filtered candidates based on race, or that some other circumstance indicated that race had played a role in Shaw's firing or in Shaw's replacement's selection. The replacement's race, standing alone, was insufficient to call UTA's reasons for terminating Shaw into question.

Thus, viewing the record as a whole, there was no evidence that would allow a reasonable factfinder to disbelieve UTA's stated reasons for firing Shaw and to conclude that race was a motivating factor in the termination decision. *See id.* at 510 (concluding similarly in age discrimination case even though younger individual was hired over plaintiff and employer made age-related inquiry during interview). Shaw failed to carry her burden under the *McDonnell Douglas* framework, so the trial court could not deny UTA's plea under path two.

Because neither path one nor path two supported the trial court's ruling, we sustain UTA's dispositive issue.

### IV. Conclusion

UTA was immune from suit absent some evidence that it violated Chapter 21, and Shaw presented no such evidence. Accordingly, the trial court erred by denying UTA's plea to the jurisdiction. We reverse the trial court's order and render judgment

---

[24]Shaw's replacement had worked for more than five years at another Texas university as an executive assistant in the office of the president.

dismissing the case for want of jurisdiction.  *See* Tex. R. App. P. 43.2(c); *Flores II*, 709 S.W.3d at 510 (reversing and rendering judgment dismissing case when plaintiff failed to produce evidence of pretext).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: May 21, 2026